IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 7, 2022 Session

## STATE OF TENNESSEE v. ASHLEY NICOLE THOMAS

**Appeal from the Circuit Court for Tipton County**
**No. 9732    Joseph H. Walker III, Judge**

_____

### No. W2021-00534-CCA-R3-CD

_____

The Defendant, Ashley Nicole Thomas, was convicted by a Tipton County Circuit Court jury of one count of aggravated neglect of a child eight years of age or less; one count of aggravated child neglect; three counts of sexual exploitation of a minor; one count of facilitation of sexual exploitation of a minor; three counts of criminal responsibility for the rape of a child; and one count of continuous sexual abuse of a child in violation of the Child Protection Act.  For these convictions, she received an effective forty-year sentence.  On appeal, the Defendant contends that the trial court erred (1) when it allowed the State to amend the indictment on the first day of trial, thereby substantially changing the nature of the case; (2) by allowing the State to make its election of offenses for the Child Protection Act counts after the commencement of trial in violation of Tennessee Code Annotated section 39-13-508(d), which requires a written thirty-day notice; and (3) by failing to dismiss the indictment due to the State's destroying pornographic videos prior to her trial in violation of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999).  Because the Defendant was acquitted of one of three required predicate offenses to support the continuous sexual abuse of a child conviction, the judgment of the trial court in Count Thirteen is reversed, the conviction is vacated, and the charge is dismissed.  We, likewise, remand this case for the entry of a corrected judgment in Count Five to reflect the jury's guilty verdict.  The remaining judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court**
**Affirmed in Part; Reversed in Part; Dismissed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined.  JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Vicki L. Green, Millington, Tennessee, for the appellant, Ashley Nicole Thomas.

_____

[1] Presiding Judge John Everett Williams died September 2, 2022, and did not participate in this opinion. We acknowledge his faithful service to this court.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and James Walter Freeland and Jason R. Poyner, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case involves multiple allegations of sexual abuse by the Defendant's oldest daughter against the Defendant and the Defendant's then-boyfriend, David Henson. For these crimes, on November 6, 2018, the Tipton County Grand Jury returned a thirteen-count indictment against the Defendant, charging her with two counts of aggravated neglect of a child eight years of age or less (Counts One and Two); four counts of sexual exploitation of a minor under thirteen years of age (Counts Three, Four, Five, and Seven); four counts of criminal responsibility for the rape of a child (Counts Six, Eight, Nine, and Ten); one count of sexual battery by an authority figure (Count Eleven); and two counts of continuous sexual abuse of a child in violation of the Child Protection Act (Counts Twelve and Thirteen). *See* T.C.A. §§ 39-11-402; -13-518; -13-522; -13-527; -13-529(b)(2); -15-402(a)(3).

On July 13, 2020, the State filed a motion to amend the indictment. The State sought to amend Count Two by deleting the words "a child under eight (8) years of age" to make the charge consistent with the victim's age and to amend Count Eleven to reflect a charge of aggravated sexual battery of a child under thirteen years of age instead of the offense of sexual battery by an authority figure. *See* T.C.A. § 39-13-504(a)(4). The record indicates that the motion was granted. The matter proceeded to a jury trial held on July 14 through July 16, 2020.

At the trial, the Defendant's mother and the victim's grandmother testified that she received a text message from the Defendant in 2017, though she had not been in contact with the Defendant for about a year and a half prior. The victim's grandmother became aware that at that time, the Defendant was living in Munford with Mr. David Henson and the Defendant's two daughters, who were not Mr. Henson's biological children. The victim's grandmother indicated that prior to her losing contact with the Defendant, the Defendant and Mr. Henson had been living together at an apartment in Covington. In addition, the victim's grandmother confirmed that while the couple was living in Munford, the Defendant gave birth to a third daughter, Mr. Henson's child.

Following the victim's grandmother's reconciliation with the Defendant, communications with the Defendant were only by text messaging at first, but the two women eventually began to talk on the telephone and had conversations lasting between twenty to thirty minutes. The victim's grandmother never visited the Defendant's home in

- 2 -

Munford, and she did not come into contact with Mr. Henson until she saw him at the police station following the victim's disclosure of these allegations.

After resuming contact with the Defendant, the victim's grandmother began meeting the Defendant at the Defendant's place of employment in Munford. During the victim's grandmother's first meeting with the Defendant, they talked about the behavioral problems of the Defendant's six-year-old daughter, who was the middle daughter. According to the victim's grandmother, the Defendant relayed to her that the Defendant's middle daughter did not obey the Defendant and Mr. Henson, and that although they "were tired of giving [the middle daughter] spankings and stuff," they did not want to send the middle daughter to "Lakeside." The victim's grandmother suggested that the Defendant let the middle daughter stay with her for a while and that she would care for the middle daughter.

At some point thereafter, the middle daughter came to live with the victim's grandmother and her husband for about three months, during which the victim's grandmother did not notice the middle daughter's exhibiting any behavioral issues. According to the victim's grandmother, she had minimal contact with the victim initially while the middle daughter was living with her. However, after a little while, the middle daughter wanted to see the victim, and, as a result, arrangements were made. The victim's grandmother would pick up the victim from school and bring the victim to her house for a couple of hours in the evening for the two sisters to visit. The victim's grandmother would then take the victim to the Defendant's workplace and drop her off with the Defendant when the Defendant got off work.

On one occasion, the victim stayed at her grandmother's house for a weekend. During this visit, the victim's grandmother noticed that the victim was acting unusual. The victim's grandmother explained that previously, the victim "was very outgoing, always smiling, playing," but the victim "was more like a child, smaller-child state," during this visit. The victim's grandmother indicated that the victim was "[g]etting into things that she shouldn't be at her age," "kind of acting out," and "[p]laying vampire with her sister, which looked like a bunch of hickeys on her sister."

At some point during the weekend, the victim indicated to her grandmother that "she wanted to talk . . . about something, she needed help with something." The victim asked for her grandmother's husband to leave the room because it was private and because he was "a boy." After he left the room, the victim disclosed to her grandmother that Mr. Henson "was touching her in the wrong spots." The victim described one incident in which Mr. Henson told the victim to come into the living room and close her eyes, and he got down on his knees in front of the her. The victim relayed to her grandmother that while her eyes were closed, Mr. Henson "started touching her in her private area," which scared her. The victim described another incident in which, one night, Mr. Henson "made her lick

- 3 -

his rectum until she got so tired she couldn't do it anymore." According to the victim's grandmother, the victim was upset and crying during the disclosure.

The victim's grandmother also testified that the victim relayed that Mr. Henson had been teaching her about sex. The victim told her grandmother that Mr. Henson had been "teaching her how to be with a guy by putting a condom on a . . . cucumber or something." The victim's grandmother informed the victim that it was not Mr. Henson's "place to be teaching [her] that anyway," rather it was the victim's mother's place.

The victim's grandmother recalled that the victim told her the abuse "would happen at different times" and that it had been occurring for a while, though the victim could not provide a specific timeframe. When the victim's grandmother asked the victim why she did not tell the Defendant about this, the victim said that she was scared she would not be believed. The victim's grandmother explained that she asked the victim if the Defendant was present or gone when this happened. The victim replied that most of the time the Defendant was at work but that, on one occasion, the Defendant was present in the bedroom sleeping. The victim's grandmother denied that she said, "[O]h, my God, your mama allowed that to happen," although the victim stated during her forensic interview that the victim's grandmother made the statement.

The victim's grandmother stated that after the victim disclosed the abuse, her husband came back into the room, and they asked the victim how she wished to proceed. The victim told her grandmother that she wanted to go to the police and tell them what had happened. The victim's grandmother then called the Defendant and told the Defendant that she was not bringing the victim back home and that they were going to the police station. According to the victim's grandmother, the Defendant seemed scared upon receiving this information and said Mr. Henson was "very controlling." Nonetheless, the victim's grandmother reiterated that the victim would not be returning to the household, and she told the Defendant that she could meet them at the police station. After they all arrived at the police station, roughly around the same time, they were interviewed by the officers.

Munford City Police Detective Bert Zickefoose testified that he became involved in the case in January 2017, after the victim, the Defendant, and the victim's grandmother came to the police station. When the officers learned of allegations of child sex abuse, they contacted the Department of Children's Services (DCS) to conduct a forensic interview.

Ms. Sydni Turner, a forensic interviewer with the Carl Perkins Center, testified that she conducted a forensic interview with the victim on January 27, 2017, at the Tipton County Child Advocacy Center. Ms. Turner was asked to explain what "grooming" was in the context of her work. She stated that "grooming" was "whenever a child [was] befriended by an adult in an attempt to gain their trust and to lower the child's inhibitions

- 4 -

in preparation for sexual abuse." She then provided examples, "Grooming with sexual abuse is like threats or violence, giving gifts, like befriending a parent, and then normalizing, like, sexual behavior and things like that."

The video recording of the victim's interview was played for the jury. During the interview, the victim told Ms. Turner that she was nine years old and in the third grade. She also said that she had two sisters, who were ages six and one, and she and her middle sister where currently living with her uncle.

The victim told Ms. Turner that her "dad," referring to Mr. Henson, had "mental issues." When Ms. Turner asked the victim to tell her about those mental issues, the victim described both physical and sexual abuse. The victim indicated that she was scared to tell the Defendant about the abuse because she was afraid the Defendant would tell Mr. Henson. The victim said that on one occasion when Mr. Henson slapped her face with his hand, which "really hurt," her mother watched. She also said that Mr. Henson "whooped" her with a leather belt, leaving "blue marks" on her legs, and that her mother saw these marks. According to the victim, Mr. Henson slapped her face twice, once leaving red "finger marks," and he spanked her more than once.

When Ms. Turner asked the victim to tell her about Mr. Henson's making her "suck his thing," the victim answered that sometimes he made her "lick his, uh, back end, too." The victim indicated that "it happened a lot," that "it started last year" when she was about eight, and that it most frequently occurred in the living room. The victim further explained, "Well, he just makes me suck his thing and like when we watch wrestling. . . . Sometime[s], uh, I look back and then Mommy's doing it." She said that her mother "was either licking his thing or rubbing his boobies," which happened "[u]sually every time." Ms. Turner asked the victim to help her understand what she saw her mother and Mr. Henson doing, and the victim replied, "Um, S.E.X, and one time, uh, he put a—he taught me how to put a condom on. And he put a condom on a cucumber and a—I think it was a banana and he made Mommy stick it in her." When Ms. Turner asked "[h]e made Mommy what," the victim said, "Stick it in him. . . . Uh, his backend." She believed that after this occurred, the Defendant then started touching Mr. Henson's "thing."

When Ms. Turner asked the victim to tell her about Mr. Henson's teaching her to put on a condom, the victim explained, "We were in the bathroom and he called me back there and he . . . he pulled down his pants and he put the condom on . . . his thing." The victim said that Mr. Henson "stretched it out and then he put it on his thing," which was "sticking out straight." According to the victim, the Defendant, who was in the bathroom with her and Mr. Henson, then instructed the victim, "[W]hatever you do don't lick the condom." After the victim left the bathroom, the Defendant and Mr. Henson remained in there alone for "about three minutes probably." She said that it was cold outside, and she thought it was Christmas break or "one of the snow days." According to the victim, the

condom was either white or silver, and "you could see through it." She said that the condom box was "blue with white" on it. The victim indicated that she was nine years old at the time and that Mr. Henson put the condoms in the drawer under the television in the living room.

The victim told Ms. Turner that Mr. Henson kept showing her and teaching her about sex "one thing at a time." According to the victim, the Defendant told Mr. Henson not to teach the victim that "stuff yet" because the victim "might go off and tell somebody." The victim continued, "Cause she told me not to and if I told somebody, I'd be scared to tell them. . . . And then, I would be scared that they'd go to the (inaudible) and then I got took away from my mom."

When Ms. Turner asked the victim to explain how Mr. Henson started with one thing at a time, the victim responded that Mr. Henson "started with movies and then he started doing it personally." She said Mr. Henson first showed her "lesbian movies and then like the boy and girl movies." The victim explained that the "lesbian movies" showed "[t]wo girls having [sex]" and that "they had these, uh, strap on thingies on." The victim indicated that the strap on thingy was either purple or white with possibly some black and "looked hard." She described that "it looked like the actual thing," meaning "[t]he front part" of a boy's "private." According to the victim, Mr. Henson showed her the movie in the back bedroom on the DVD player. When Ms. Turner asked who was present when Mr. Henson played the movies, the victim said that her younger sister, the Defendant, and Mr. Henson were all there.

The victim stated that on one occasion she, the Defendant, and Mr. Henson were watching one of the pornographic movies in the back room. The victim indicated that she was sitting while the Defendant was lying on the bed with Mr. Henson; all were naked. The victim recalled that she could see the Defendant's "boobies and her cookie" and Mr. Henson's "belly and his legs and his bottom and his thing." According to the victim, the Defendant and Mr. Henson "were kissing." The victim believed she was around seven at this time.

Ms. Turner asked the victim about her earlier comment when she "said something about him doing it personally." The victim said that she meant sex and indicated that Mr. Henson "started teaching [her] and showing [her] stuff." She explained that Mr. Henson "started showing [her] . . . the puppy dog," though she could not recall what the particular moves were. The victim indicated that Mr. Henson taught her moves by acting it out with the Defendant. The victim also said that Mr. Henson taught her "moaning." She explained, "He, Mommy started moaning and then he, and then he's like Mommy's moaning." According to the victim, this happened on the bed when the Defendant and Mr. Henson were naked and having sex. She explained, "Uh, I think it was just the puppy dog. . . .

Where the girl lays on her both knees and hands and then the boy sticks his thing in there." The victim also believed she was seven when this occurred.

The victim next told Ms. Turner about a time when they were in the living room and Mr. Henson told the victim to stick her fingers in his behind. The victim explained, "Like he told me to start with one finger and then try to put two fingers and then try to fit three fingers and four fingers and then my whole hand." She stated that Mr. Henson was naked with his legs "straight up" and that she was under Mr. Henson's legs when she did this. The victim recalled that it happened when she was nine years old, sometime before Christmas.

The victim told Ms. Turner about another occasion when Mr. Henson used his hand to touch her "down here" while she was standing up naked in the living room. The victim said, "All I know is that it hurt and I don't know what he did." The victim indicated that Mr. Henson then "started rubbing [her] boobies" and "pinching them." When Ms. Turner asked where the Defendant was during this episode, the victim said, "Uh, on the couch." The victim indicated that prior to Mr. Henson's touching her, she witnessed the Defendant and Mr. Henson having sex on their knees "[f]acing apart but . . . facing the same way." She said that she was "standing up beside them." Ms. Turner asked the victim whether Mr. Henson "touch[ed] [her] private one time or more than one time," and the victim responded, "More than one. . . . We used to do it a lot. . . . Mm, pretty much every day."

Ms. Turner asked the victim to "tell [her] about him making [her] suck his thing." The victim responded, "Well, he wants me to lick it and then sometimes when I lick his bottom my tongue starts to get tired, and I have to stop for a little bit." She explained that Mr. Henson had her lick "[h]is hole" with her tongue, that "sometimes he would make [her] lick his pee hole," and that he made her "suck his thing" "[l]iterally every day." She was eight when it occurred the first time, and she was nine when it last occurred. The victim said it would happen in the living room or the front bedroom, and she indicated that it happened "usually right after, uh, he [took] it out of" the Defendant's bottom. The victim said that it "taste[d] gross." She said that when this happened, the Defendant was often "right in front of" Mr. Henson and that the Defendant was either standing up or sitting on her knees, though sometimes the "poses" would be different. The victim continued, "[S]ometimes Mommy would lay on her back and stuff like that. . . . [and Mr. Henson] would stick [it] up, stick it in her." Afterwards, the victim had to suck Mr. Henson's thing, which tasted "[n]asty." The victim recalled that sometimes Mr. Henson made her "lick it when Mommy was bleeding." She also said that often after she licked his thing, he stuck it back inside the Defendant.

When the victim was asked if the Defendant ever touched her body or did something to her, the victim replied, "Not really." The victim was asked to explain and said, "[S]he only touched me once. . . . She didn't really touch me that much though." The victim

recalled that the Defendant touched her in "[t]he front" with "[h]er hand" while they were both naked. Mr. Henson was also there, and the victim recalled that he was either "touching Mommy" or they were having sex.

Following a break in the interview, Ms. Turner asked the victim about the time "[she] said that he tried to put it in [her]." The victim said that the Defendant was bleeding and "went to go get a baby wipe or some tissue." While the Defendant was gone, Mr. Henson told the victim "to sit on him" and "he just like stuck, uh, touched [her] with it." She thought he tried to put it inside her "private" but was not certain. She recalled that Mr. Henson was naked and sitting down at the time. She said that it "[f]elt weird." According to the victim, Mr. Henson might have stopped when the Defendant "walked in or something." The victim said that she was nine years old at the time.

The victim indicated that she told her grandmother about the abuse and that her grandmother responded, "Oh my God, Mommy actually let that happen." However, the victim explained, "But Mommy didn't pretty much know about anything."

Finally, Ms. Turner asked the victim if there was "ever a time that, uh, someone gave [her] something for, um, for sucking on him or touching him or something like that?" The victim responded, "Just a dollar. He only did that once." She said that on this occasion, Mr. Henson had on his clothes, and "[h]e just lifted up his pants and then made [her] touch his private." The victim recalled that this occurred when she was eight years old and out of school for summer break.

Detective Zickefoose confirmed that he watched on a video monitor as the forensic interview was conducted. Following the victim's forensic interview, on January 28, 2017, Detective Zickefoose, along with other officers, went to the Defendant and Mr. Henson's home. When the officers arrived at the home, they asked for consent to search for items that had been mentioned by the victim in the forensic interview. After receiving written consent to search from the Defendant and Mr. Henson, Detective Zickefoose walked through the home, which was recorded on his body camera. Photographs of the home were likewise taken.

The body camera footage, as well as thirty-four photographs, were entered into evidence and shown to the jury. Referencing items shown in photographs, Detective Zickefoose noted that in the bedroom, they found evidence of several pornographic DVDs, two books of a sexual nature, "[s]exual toys," and condoms in white packages. According to Detective Zickefoose, the children were removed from the Defendant's home "for their safety until an investigation could be conducted," and a "no contact" order with the children was issued against the Defendant and Mr. Henson by the juvenile officer for Tipton County.

David Henson testified and affirmed that he had a jury trial for various offenses related to the sexual abuse of the victim and that at some point during the trial, he entered "best interest" pleas to charges of rape of a child and other crimes. He indicated that he had known the Defendant for four or five years, that they met online, and that shortly after meeting online, they met in person. He learned at some point during their courtship that the Defendant, who was living in Mississippi, had two daughters. Mr. Henson later moved into a home in Covington with the Defendant and her two daughters, though Mr. Henson had only met the victim once prior to that time. Mr. Henson recalled that when he first met the Defendant's daughters, the younger daughter was "talking" and the victim was "a few years" older. He also asserted that the victim's grandmother had visited the family once while they lived in Covington. About five or six months after moving to Covington, they "got put out by the landlord" for non-payment of rent and that the family moved into a home in Munford. According to Mr. Henson, the Defendant initially was a stay-at-home mother while he worked, but she found employment about a year after moving to Munford.

Mr. Henson confirmed that at some point, all three of the children, including his own child, were removed from the couple's custody based upon these allegations. He indicated that he and the Defendant were still living together and that they regularly attended custody hearings together. In addition, Mr. Henson affirmed that he had seen the video recording of the forensic interview. Though he acknowledged that he had entered best interest guilty pleas, he denied all of the victim's allegations made during the interview. He admitted that one night he put a condom on a banana, but he maintained that he "had never had sex with [the Defendant] in front of the children[.]" Mr. Henson also denied that the Defendant did anything to the victim and asserted that the Defendant "loved her kids." He believed the Defendant cried at his trial when he was taken into custody because she knew that they were both innocent of any wrongdoing.

The victim's adoptive mother testified that she adopted the Defendant's three daughters after providing them with foster care through DCS and that the victim came to live with her "when she was [eight] turning [nine] years old." Both of the older girls had changed their first and last names. According to the victim's adoptive mother, the victim now referred to her as "mama." The victim's adoptive mother testified that the victim was presently "a happy child, a loving child," who did well in school and was interested in volleyball and cheerleading. The victim's adoptive mother explained that when the victim originally came into her care, the victim "was scared."

The victim's adoptive mother testified that a DCS worker had given the cell phone number of the victim's adoptive mother to the Defendant because the two older girls were "wanting to know about their little sister," a fourth child recently born to the Defendant. The Defendant contacted the two girls, and they started talking by telephone, and then by text message. In a telephone conversation with the Defendant, the Defendant told the

victim's adoptive mother that the girls could visit their little sister, but only "if they didn't talk." The telephone speaker was activated, and, as a result, the girls heard this conversation. They also learned that the Defendant had chosen a name for her fourth child that was similar to the victim's nickname.

According to the victim's adoptive mother, the victim was very upset with the Defendant after overhearing the conversation and began sending text messages to the Defendant from the victim's adoptive mother's cell phone. The victim told the Defendant how the victim felt. A screenshot of the text message exchange was admitted into evidence. In that screenshot, the Defendant sent the following text to the victim's adoptive mother, "I was hoping after all this time she would want to but I do love them like I said if they change their mind I'm here." The victim, using her adoptive mother's cell phone, replied,

> I won't ever change my mind I hate you, you named her [that] really, after what you and that monster done to me, I hope you stay in jail just as long as that monster[.] This is [the victim] see you in court, that's all I ever have to say to you I hate you, so she's your next [the victim's prior nickname] the same thing is going to happen to her[.] [S]he need[s] to be . . . with someone that's going to keep her safe, not YOU.

The Defendant replied that she thought everyone knew her new daughter's name and apologized. The Defendant explained that her fourth daughter's father chose the name and that she "just want[ed]" them to know.

In a second screenshot, the text messages continued approximately one minute later. The Defendant said, "And u r more than welcome to see ur sister anytime you want to.[] I want yall to have a relationship with her and so does her dad." The victim responded as follows:

> You don't love us please stop saying that yeah you should be sorry for what you have done all I wanted to do was see the baby I never wanted to see u except in court how are you on my side if you let that happen to me and I'm a young lady with a voice now and I can use it my momma taught everything I know #its not you if you [were] really any mom you would put our baby sister here where she would be safe with us because you can't hurt people and think your going to get away with it . . . and that is all I have to say to you giving the phone back to my mom that's not her dad you know [Mr. Henson's] her dad we all know that.

The victim's adoptive mother acknowledged that the victim was angry with the Defendant for "the things she let happen" to the victim. The victim's adoptive mother blocked the Defendant's telephone number after this incident. The victim's adoptive

mother also indicated that after the two older girls came to live her, they received counseling for about two to two-and-one-half years. The victim's adoptive mother described them now as "happy and healthy."

The twelve-year-old victim testified that since these events, she and her two younger sisters had been adopted and had taken new names. The victim confirmed that when she was nine years old, she participated in a forensic interview conducted by Ms. Turner. The victim confirmed that she was the person speaking in the recording of the forensic interview, that the recording accurately reflected what occurred during the interview, and that she made truthful statements during that interview. The victim also identified the screenshots of text messages between her, her adoptive mother, and the Defendant. The victim asserted that the Defendant told them they could visit their newest sister "if [they] didn't talk." The victim identified Mr. Henson as "the monster" to which she referred in her text messages. The victim also believed that the Defendant was crying at Mr. Henson's trial because Mr. Henson was taken into custody and not for any reason related to the abuse the victim suffered at the hands of Mr. Henson. The victim confirmed that she was still angry with the Defendant because the Defendant "should have stopped it when it started."

When asked if she recalled anything else about the Defendant since the forensic interview, the victim testified, "I remember [the Defendant] saying that she was tired and for [the victim] to perform." The victim explained that at this time, she, the Defendant, and Mr. Henson were in the house and that the Defendant "said she was tired because she was having sex with" Mr. Henson. According to the victim, the Defendant asked the victim "to go in the room and touch" Mr. Henson, and in response, the victim "touched his private parts." The victim agreed that she did not convey this information to Ms. Turner during the forensic interview.

The victim's uncle testified for the defense that his relationship with the Defendant's children began "[w]hen they were babies." He affirmed that he sometimes kept the girls after they got out of school when the Defendant was living with Mr. Henson. The victim's uncle asserted that he and the children played video games and sometimes went out to eat. He denied noticing any change in the girls' behavior during that period of time.

The victim's uncle stated that when the victim disclosed the abuse, the children were originally placed with him and his fiancée. At that time, he noticed that the children "weren't themselves" and that "[t]heir behavior was unregular [sic]." He explained that "they got where they didn't listen" to him. The victim's uncle denied that the children appeared to be afraid of the Defendant or that they were angry with her. The victim's uncle further denied any appearance that the children did not love or respect the Defendant.

Robert Unthink testified that he was presently living with the Defendant and their daughter, as well as with the victim's uncle and his fiancée. Mr. Unthink testified that he

had known the Defendant for "almost three years" and that they had started dating about two-and-a-half years ago. Mr. Unthink stated that he started living with the Defendant after he learned she was pregnant. He confirmed that it was he who named their daughter, though the Defendant did not disagree with his choice. Mr. Unthink confirmed that the Defendant was in counseling for depression. He said that he and the Defendant did not talk about what happened with Mr. Henson.

Mr. Unthink testified that when he and the Defendant had sex, their daughter was upstairs asleep. He denied "enjoy[ing] an occasional porno video with [the Defendant]," and stated, "There's no porn in our house."

The Defendant testified that she had been a victim of abuse, that she was still in counseling for post-traumatic stress disorder and manic depression, and that she took medication for manic depression. The Defendant stated that prior to her relationship with Mr. Henson, she was involved with a man who "violently and sexually attacked [her] one night and put [her] in the hospital," choking her until she passed out and leaving bruises on her. She said that during this encounter, her former boyfriend raped her, and she believed he was going to kill her. The Defendant asserted that she reported the incident to the police but that "[t]hey said that because it had been more than [seventy-two] hours, there was nothing further they could do" to help her. She explained that she returned to her former boyfriend "[b]ecause [she] was scared and he apologized and said he was going to change." At the end of the relationship, the Defendant moved to Mississippi.

While living in Mississippi, the Defendant met Mr. Henson online. The Defendant said that after a month and one-half into their online relationship, she and her two girls moved back to Tennessee to live with Mr. Henson because she needed help and wanted to return home. When the Defendant met Mr. Henson, the victim was age six and her middle daughter was age four. According to the Defendant, she and Mr. Henson were only roommates initially, but their relationship developed into something more. The Defendant indicated that by the time the family moved into the home in Munford, she was pregnant with Mr. Henson's child and had quit her job as a server.

The Defendant confirmed that her middle daughter eventually left the home and went to stay with the Defendant's mother. The Defendant explained, "I felt like it was for her safety and ours. She was always fighting with her sister, so I was trying to get some outside help from my mother." The Defendant said that when her middle daughter would get into trouble, Mr. Henson "would usually spank her or stick her in the corner or ground her from everything."

The Defendant testified that Mr. Henson physically abused her on one evening by throwing her up against a wall, leaving bruises on her arms. She also asserted that there was verbal abuse. The Defendant testified that she was afraid to leave him and confirmed

- 12 -

that there was a period of time when she lost contact with her mother due to Mr. Henson's controlling nature. According to the Defendant, Mr. Henson "always told [her] that he'd find [her] and that he'd hurt [her,]" and "[b]efore he went to jail, he told [her] he'd have [her] killed." When asked why she was crying after Mr. Henson was convicted of the crimes against the victim, the Defendant explained, "I felt like I had lost all chances to even try to be in my kids' lives. And I love them so much. I love my kids with everything, and I just felt like I was a failure and that I had lost everything."

The Defendant testified that Mr. Henson kicked her and her daughters out of the house on Christmas Eve 2015 because the Defendant and Mr. Henson had been fighting. She testified that she went to stay with her mother for a few weeks, and as the time for her baby to be born got closer, Mr. Henson called and apologized and said he wanted her to return. According to the Defendant, Mr. Henson said that he wanted to be in the baby's life and that things were going to be different, and she went back to him.

The Defendant denied that Mr. Henson ever showed any sexual interest in her children while they lived together. She further denied that the victim's behavior changed in any way to suggest that anything inappropriate had been taking place or that the victim ever confided in her that Mr. Henson was abusing her. The Defendant asserted that the first time she learned of the alleged abuse by Mr. Henson was when they met at the police station. She further indicated that the first time she learned of the victim's allegations against her was after Mr. Henson's trial when she was arrested. The Defendant said she did not know what the victim was talking about until she saw the recording of the forensic interview, which shocked her and caused her to cry.

The Defendant stated that she was aware that there were six pornographic movies found in her home. Though she admitted that she and Mr. Henson watched them a few times together in their bedroom, she said, "I always locked them back up in our closet." She stated that the sex toys were locked in the closet as well. Although she acknowledged that the police found those items in a drawer and out in the open when they searched the home, she explained that the children had already been taken away by that time. The Defendant denied that she was there when the victim saw the pornographic movies and that she knew the victim had seen the movies.

The Defendant denied having sex with Mr. Henson in front of her children. The Defendant indicated that she only had sex with Mr. Henson in the bedroom with the door closed and that they never had sex in the living room or in the bathroom of the home. She testified that for a while, they did not have sex because she was pregnant. According to the Defendant, after her third child was born, they waited six weeks to have sex, and then they only had sex maybe two or three times a week, mostly on weekends. In addition, the Defendant denied that she and Mr. Henson had sex every day; that they ran around naked in the home; that she crawled into bed with Mr. Henson and the victim; that the victim ever

saw her naked; that she told the victim to take over her job of having sex with Mr. Henson; or that she taught the victim how to use a condom or put a condom on Mr. Henson.

The Defendant was also asked about the telephone conversation and text messages exchanged with the victim. The Defendant denied threatening her daughters that they could only see their new sister if they did not testify. The Defendant recalled they were setting up somewhere to meet when the victim asked her where her new sister was going to live while the Defendant was incarcerated. According to the Defendant, when she told the victim that the child would live with Mr. Unthink, the victim became angry and said that she did not want to see the Defendant anymore.

The Defendant averred that she now believed Mr. Henson was guilty, that she was angry at him, and that she believed "he got what he deserved." She explained that initially after the allegations were made, she was in shock and did not know what to think. She indicated that if the victim would have told her what was happening, she would have stopped it and informed the police.

On cross-examination, the Defendant testified that when they moved into the home in Munford, she was age twenty-five and Mr. Henson was age twenty-one. She confirmed that on one occasion, Mr. Henson spanked the victim with a paddle that left marks on her and that on another occasion, he slapped the victim's face. The Defendant asserted that she and Mr. Henson fought over the way he disciplined the children, as well as their having an argument about his teaching the victim how to use a condom. According to the Defendant, most of the time she was in the relationship with Mr. Henson, he drove their only car; however, she did have a cell phone and remained in contact with her brother and some friends.

Though six pornographic videos were found in her home, the Defendant said that she was only aware of three and that she did not know where the Defendant kept the other three. She did know about the sex toys found in the home, stating that Mr. Henson bought those while they were separated during Christmas 2015. The Defendant asserted that Mr. Henson bought the pornographic movies after she had his child because she "couldn't satisfy him." She also stated that they waited almost ten weeks to have sex after the child's birth, clarifying her earlier statement that they waited six weeks. According to the Defendant, they always slept in their bedroom except for a couple of weeks when the floor in their bedroom was being replaced.

The Defendant indicated that following her losing custody of her oldest two daughters, she returned to the home to live with Mr. Henson, along with her youngest child at that time, Mr. Henson's daughter. She explained that she did not "have anywhere to go." The Defendant said that she "left" Mr. Henson in 2017 "before he even got arrested the first time," and she also estimated that her sexual relationship ended with Mr. Henson

around December 2017. The Defendant was then shown Facebook posts from May 17, 2018, which was after Mr. Henson was convicted of sexual acts against the victim, and those posts were entered into evidence. In the posts, the Defendant was asked how Mr. Henson was doing, and she replied that he seemed okay and that they "were gonna make it." The Defendant was then asked when were the authorities going to move Mr. Henson to another prison, and the Defendant responded, "Just txt me but idk."

The Defendant clarified that while she did believe something happened between Mr. Henson and the victim, she only believed that he touched her inappropriately and showed her how to put on a condom. The Defendant did not believe most of what the victim described in the forensic interview. The Defendant was adamant that no sexual acts involved her. The Defendant said that most of the acts described by the victim in the forensic interview sounded like a pornographic movie, though the Defendant was unsure where the victim learned of such things.

Following the conclusion of proof, the jury found the Defendant guilty as charged of one count of aggravated neglect of a child eight years of age or less (Count One); one count of aggravated child neglect (Count Two); three counts of sexual exploitation of a minor under thirteen years of age (Counts Four, Five and Seven); three counts of criminal responsibility for the rape of a child (Counts Eight, Nine, and Ten); and two counts of the knowing failure to prevent the continuous sexual abuse of a child over a ninety-day period or more in violation of the Child Protection Act (Counts Twelve and Thirteen). In Count Three, she was found guilty of the lesser included offense of facilitation of sexual exploitation of a minor under thirteen years of age. In addition, she was found not guilty of one count of criminal responsibility for the rape of a child (Count Six) and of aggravated sexual battery of a child under thirteen years of age (Count Eleven).

Following a sentencing hearing, the trial court sentenced the Defendant to fifteen years for aggravated neglect of a child eight years of age or less in Count One; eight years for aggravated child neglect in Count Two; two years for facilitation of sexual exploitation of a minor under thirteen years of age in Count Three; and three years for each sexual exploitation of a minor in Counts Four, Five, and Seven. In Counts Eight and Nine, the trial court merged the convictions for criminal responsibility for the rape of a child with the conviction in Count Twelve for continuous sexual abuse of a child in violation of the Child Protection Act. The Defendant was sentenced in Count Ten to twenty-five years for criminal responsibility for the rape of a child and in Count Twelve to forty years for continuous sexual abuse of a child in violation of the Child Protection Act. In Count Thirteen, the trial court did not sentence the Defendant, noting that the Defendant was sentenced on the underlying convictions instead and that Counts Twelve and Thirteen each relied on Count Nine which merged into Count Twelve. The twenty-five-year sentence in Count Ten was ordered to be served consecutively to the fifteen-year sentence in Count

One, though both sentences were to be served concurrently with the forty-year sentence in Count Twelve.

Thereafter, the Defendant filed a timely motion for new trial, which was amended. Following a hearing on the Defendant's motion, the trial court denied the motion. In its written order that followed, the trial court observed that Tennessee Code Annotated section 39-13-518 required three or more predicate offenses for a defendant to be found guilty of violation of the Child Protection Act and that that the jury found the Defendant guilty in Counts Eight and Nine, but not guilty in Count Eleven. The trial court found that the Defendant should have been sentenced on the two predicate offenses in Counts Eight and Nine, rather than being sentenced in Count Twelve. Accordingly, the trial court sentenced the Defendant to twenty-five years each in Counts Eight and Nine for criminal responsibility for the rape of a child and ordered that Count Twelve be "dismissed after sentence was imposed on the predicate offenses" in Counts Eight and Nine. The trial court ordered the twenty-five-year sentences be served concurrently to each other but consecutively to the fifteen-year sentence in Count One. Ultimately, the Defendant received an effective forty-year sentence at 100% service. Amended judgments were subsequently filed. The appeal followed.

## I.     Motion to Amend Indictment

The Defendant argues the trial court erred when it allowed the State to amend the indictment on the first day of trial, thereby substantially changing the nature of the case. She asserts that "[d]espite the length of time that it took to bring this case to trial," the State filed a motion to amend the indictment three days prior to the trial and only handed a copy to defense counsel the day of trial. She submits that there was insufficient time to review adequately or to respond to the motion and that it did not allow for adequate time to have discussions with defense counsel and weigh the alternatives prior to trial. The State notes that any transcript of the trial court's ruling on the motion is absent from the appellate record and that the record, nonetheless, reflects that the trial court properly granted the State's motion to amend Counts Two and Eleven of the indictment.

On July 13, 2020, the State filed a motion to amend Counts Two and Eleven of the indictment. The certificate of service stated that the document was also hand-delivered to defense counsel that day. Though no ruling is apparent from the record, it does appear that the State's motion was granted—in Count Two, the words "a child under eight (8) years of age" were deleted to make the charge consistent with the victim's age; and in Count Eleven, the words "and the Defendant had, at the time of the offense, custodial authority over the victim and used such authority to accomplish the sexual contact" were deleted and the statute defining the offense was changed from Tennessee Code Annotated section 39-13-527 (sexual battery by an authority figure, a Class C felony) to section 39-13-504(a)(4) (aggravated sexual battery, a Class B felony). At the motion for new trial hearing, the trial

court ruled that the indictment was properly amended pursuant to Tennessee Criminal Procedure Rule 7. The trial court stated that the "possible exception might be the amendment allowed to Count [Eleven]" but noted that the jury found the Defendant not guilty of that count.

Tennessee Rule of Criminal Procedure 7(b) provides as follows:

> (b) Amending Indictments, Presentments and Informations.
>
> (1) With Defendant's Consent. With the defendant's consent, the court may amend an indictment, presentment, or information.
>
> (2) Without Defendant's Consent. Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced.

The Tennessee Supreme Court continues to emphasize the relaxation of common law pleading requirements, as well as its reluctance to promote form over substance in examining the sufficiency of an indictment. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Indictments that satisfy the requirements for adequate notice to the defendant also satisfy constitutional and statutory requirements. *Id.* Correction of an "unintentional drafting error" does not charge an additional or different offense nor prejudice a substantial right of the defendant if the indictment clearly charges the essential elements of the offense. *State v. Beal*, 614 S.W.2d 77, 80 (Tenn. Crim. App. 1981). A trial court's ruling on a motion to amend an indictment is reviewed for an abuse of discretion. *State v. Kennedy*, 10 S.W.3d 280, 283 (Tenn. Crim. App. 1999).

Both Counts One and Two charged aggravated child neglect and included the relevant offense dates, the victim's date of birth, the appropriate offense statute, and the elements of the offense. The amendment to Count Two only corrected the victim's age, thereby, reducing the felony grade classification from Class A to Class B. The Defendant would have had notice of the misconduct charged and should not have been misled or surprised by the amendment. We conclude that the trial court did not err when it allowed the "unintentional drafting error" to be corrected in that the amendment did not charge an additional or different offense or prejudice a substantial right of the Defendant. *See Beal*, 614 S.W.2d at 80. As noted by the trial court, the Defendant was not convicted of any offense in Count Eleven, regardless of any error in the amendment to that charge. Therefore, her argument relative to Count Eleven is moot. *See State v. Joshua Chambers*, No. M2019-00694-CCA-R3-CD, 2020 WL 1493940, at *18) (Tenn. Crim. App. Mar. 26, 2020) (citing *State v. William E. Hale*, No. 03C01-9104-CR-115, 1991 WL 251500, at *2 (Tenn. Crim. App. Nov. 27, 1991)). She is not entitled to relief on this basis.

## II.     Child Protection Act Election

The Defendant argues that the trial court erred by allowing the State to make its election of offenses for the Child Protection Act after the commencement of the trial in direct violation of Tennessee Code Annotated section 39-13-508(d), which requires that an election be filed no later than thirty days prior to the trial.  She argues that by failing to comply with the statutory requirement, the State gave the appearance that it did not intend to go forward on those counts and that she was denied adequate time to discuss the filing with defense counsel and review options prior to trial.  The State responds that the record reflects that it filed the appropriate notice and that, regardless, any failure to give written notice identifying the predicate acts in Counts Twelve and Thirteen does not warrant corrective action because Count Twelve was ultimately dismissed and because a sentence was not imposed for Count Thirteen.

The jury instructions reflect that for the three underlying predicate offenses in Count Twelve, the State relied on Counts Eight (criminal responsibility for rape of a child), Nine (criminal responsibility for rape of a child), and Eleven (aggravated sexual battery). Relative to Count Thirteen, the instructions reflect that the State relied on Counts Six (criminal responsibility for rape of a child), Nine (criminal responsibility for rape of a child), and Ten (criminal responsibility for rape of a child) as the predicate offenses.

At the motion for new trial hearing, the trial court addressed the State's failure to elect three offenses prior to trial in Count Twelve.  The trial court observed that the State relied on other counts in the indictment as notice identifying the multiple acts of sexual abuse of a child upon which the violation of the Child Protection Act in Count Twelve was based.  The trial court determined that no violation occurred because the State gave notice by filing the predicate offenses in separate counts of the indictment and that pursuant to the statute, the State was not "required to elect submission to the jury of the several counts," citing Tennessee Code Annotated section 39-13-518(f).  The trial court further noted that Count Thirteen also relied on Count Nine as a predicate offense and that "[t]he election was made in Count [Thirteen] for the [D]efendant to be sentenced instead for the crime for which she was convicted in the predicate offense of Count [Ten]."

The Tennessee Legislature passed the Child Protection Act in 2014, creating the offense of continuous sexual abuse of a child.  T.C.A. § 39-13-518 (2014) (subsequently amended).  Since its enactment, this court has only dealt with it on a very few occasions. *See State v. Timothy Hinson*, No. W2021-00257-CCA-R3-CD, 2022 WL 1836931, at *2 (Tenn. Crim. App. June 3, 2022) (collecting cases).  As relevant here, Tennessee Code Annotated section 39-13-518 creates the offense of continuous sexual abuse of a child and provides that a person commits this offense who, "[o]ver a period of ninety (90) days or more, engages in multiple acts of sexual abuse of a child as defined in subdivision (a)(1)(A)(i) or (a)(1)(A)(ii)."  T.C.A. § 39-13-518(b)(1) (2014).  Multiple acts of sexual

- 18 -

abuse of a child means engaging in three or more incidents of sexual abuse of the same child on separate occasions. *Id*. § 39-13-518(a)(1)(A)(i). Rape of a child and aggravated sexual battery qualify as sexual abuse of a child. *Id*. § 39-13-518(a)(2)(C), (D). The jury must unanimously agree regarding the predicate acts. *Id*. § 39-13-518(e).

Relative to the required notice of the predicate acts, subsection (d) sets out the following:

> At least thirty (30) days prior to trial, the [S]tate shall file with the court a written notice identifying the multiple acts of sexual abuse of a child upon which the violation of this section is based. The notice shall include the identity of the victim and the statutory offense violated. Upon good cause, and where the defendant was unaware of the predicate offenses listed in the notice, the trial court may grant a continuance to facilitate proper notification of the incidents of sexual abuse of a child and for preparation by the defense of such incidents specified in the statement.

*Id*. § 39-13-518(d). Subsection (f) of the statute provides for joinder of continuous sexual abuse of a child with the separate acts of child sexual abuse that constitute the offense. *Id*. § 39-13-518(f).

During a discussion of the jury charge and the predicate offenses on which the State chose to rely upon in Counts Twelve and Thirteen, the trial court asked the State whether it had filed "written notice identifying the multiple acts of sexual abuse of the child upon which the violation of this section [was] based[.]" Though the State asserted that the indictment itself provided the statutorily required written notice, it also argued that the written notice of the specific predicate offenses had been filed. The State further indicated that there was "written notice as part of the discovery given in this case of the transcript of the forensic interview and reference ha[d] been made . . . to specific acts on specific pages of a transcript." Defense counsel responded that the State had not filed a written notice, but the trial court corrected her, telling her, "It's in the file . . . . They filed a written notice." With that correction, defense counsel apologized to the court, and she confirmed that the notice was in her papers. However, the appellate record does not contain any written notice.

At the motion for new trial hearing, this matter was revisited. In the context of the election of offenses, defense counsel referred to the notice requirement under the Child Protection Act and asserted, "To this very date, it has never been filed with the [c]ourt. It is required to be filed [with the court thirty] days prior to the trial." The State again took the position that the requirement of notice under the statute was satisfied by the filing of the indictment. The State asserted that it was taking the position it could "elect the offenses

at any time before submission to the jury in the sense of narrowing them down. That was what was done by—presumably by that written notice."

The State requested that a document titled "Election of Offenses For Predicate Offenses Act For Violation of Child Protection Act" be received as an exhibit, which stated that the document was submitted to defense counsel during the trial. The trial court allowed the document to be made an exhibit "with the caveat that the record at trial would have to show what really happened" because the trial court was "not sure those were the offenses finally settled upon by the State" and presented to the jury. The trial court continued, "I think there was some problem with the ones actually picked on that written document, and the State elected some others before it was over." Though the transcript reflects that the document was made an exhibit to the hearing, it is also not included in the record on appeal.

The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *see* T.R.A.P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id*. (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). Because the appellate record does not contain the documents critical to appellate review, we cannot determine whether the State complied with the written notice required by section 39-13-518(d).

Moreover, the issue of notice is moot. Count Twelve was dismissed upon the Defendant's motion for new trial because the Defendant was found not guilty in Count Eleven. In Count Thirteen, the Defendant was "not sentenced" but, rather, was sentenced on the underlying convictions. Count Thirteen relied upon Count Six as one of the underlying predicate acts, and the Defendant was found not guilty in that count. Therefore, the conviction in Count Thirteen must be vacated, regardless of whether the trial court imposed a sentence. Because the Defendant was acquitted of one of the required predicate acts of sexual abuse, we vacate the Defendant's conviction in Count Thirteen and remand for entry of an amended judgment reflecting that the charge is dismissed.

### III.    Destruction of Evidence

The Defendant, relying on *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), argues that the State had a duty to preserve the pornographic videos that were destroyed after Mr. Henson's trial. The Defendant asserts that her defense strategy was compromised because it became impossible to determine whether the victim's description of the incidents

mirrored the activity in the videos. The Defendant also asserts that she was prohibited from providing an alternative narrative. She argues that neither the titles of the videos nor the photographs of the video casings were disclosed to the defense prior to trial; that the defense did not have the ability to find them elsewhere to compare the videos to the victim's statement; and that it was unclear whether the same videos were on the market currently or that any video with a similar name would necessarily contain the same content. The State responds that the trial court properly determined that the State had no duty to preserve the videos found in the Defendant's home.

At trial, Detective Zickefoose testified that two of the DVD casings depicted in the photographs were titled "18 and Easy" and "Young Girls Play Dirty." When Detective Zickefoose was subsequently asked to "read the title of that particular movie or box," defense counsel lodged a "continuous objection." Defense counsel argued that she had "some of these photos but not the rest of" them and that she was not provided with "any photos of the DVDs or the toys," although the items had been "described in a report." She asserted that she did not know these "things" were going to be used at trial. The prosecutor responded that "they were all provided, some digitally, some hard copy" and noted that they had an open-file policy. Without any verbal ruling from the trial court, questioning resumed. Though Detective Zickefoose was never again asked to read the titles of any of the DVD casings, photographs were entered into evidence, reflecting three additional titles of "Assbanging Bimbos," "Strap It On," and "Lipstick Lesbo."

Later during Detective Zickefoose's testimony, defense counsel objected, arguing that she had "some photographs of things that were presented," but did not have others. Defense counsel said that she would "very much have liked to have the photographs of the DVDs that were located, so [she] could try to locate the DVDs [her]self and review them." The prosecutor replied that "they were made available to her and copied for her and given to her on the date indicated on the back of the DVD, which [was] . . . in November of 2019." The trial court stated that it preferred to address discovery matters prior to trial, but the court overruled the objection, stating that it was not going to hold a discovery hearing during the trial.

After Detective Zickefoose's direct examination concluded, the discovery matter was revisited during a jury-out conference. The prosecutor stated that on November 26, 2019, he and defense counsel met in the prosecutor's office and that he provided counsel with the discovery materials. The prosecutor produced "a list of the discovery that was provided to her in [his] own handwriting" and noted that "copies were made while she was sitting there in digital format, others in copy format on the copy machine." Defense counsel objected to the document, arguing that it had not been authenticated and did not reflect her signature. However, the trial court allowed the exhibit to be entered for identification purposes, concluding that it "accept[ed] some things as officers of the court telling [it] what

went on without having to authenticate." When testimony resumed, Detective Zickefoose confirmed that the pornographic videos found at the Defendant's home were destroyed after Mr. Henson's trial.

In her motion for new trial, the Defendant argued that the State destroyed the pornographic video evidence "incident to the strategy of . . . defense counsel and did not disclose the destruction of the evidence until the testimony of the State's witness." The Defendant asserted that without the actual videos, she was precluded from determining whether the victim's description of the abuse in the report mirrored the activity in the videos. The Defendant likewise argued that she was unable to confirm that the videos and the casings matched. The State, in its response to the Defendant's motion for new trial, alleged as follows:

> The Munford Police Department disposed of pornographic videos after the preceding trial of David Henson. However, photographs of the video [casings] with titles were given to defense counsel by prior defense counsel and by the State well in advance of trial in the discovery process so that duplicates could be attained if desired. Defense counsel . . . discussed the disposal of videos with Assistant District Attorney General . . . when reviewing and receiving discovery well in advance of trial when the photographs of said video DVD [casings] were given to defense counsel. All discovery was made available and provided to defense counsel as required.

In its order denying the Defendant's motion for new trial, the trial court concluded that the Defendant had failed to show that the items were the type of evidence the State had an obligation to preserve. The court determined that the defense had not shown constitutional materiality and that the pornographic videos did not have an exculpatory value that was apparent when they were destroyed. Relative to the *Ferguson* factors, the trial court found that the State was not negligent by failing to preserve the evidence, that the evidence was of little significance, and that other evidence was sufficient to support the convictions.

To the extent that the Defendant argues on appeal that the State failed to provide discovery prior to trial, the Defendant did not include this issue in her motion for new trial. The issue of an alleged discovery violation is waived. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error . . . unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial).

Turning to the issue of destroyed evidence, in *Ferguson*, our supreme court held that "the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d at 915-16). Upon determining that the due process clause under the Tennessee Constitution was broader than the due process clause under the United States Constitution, the Tennessee Supreme Court rejected the "bad faith" analysis adopted by the United States Supreme Court which provided that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Rather, the Court in *Ferguson* adopted a balancing approach requiring the trial court to determine "[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." *Id.* at 785 (quoting *Ferguson*, 2 S.W.3d at 914).

Whenever a *Ferguson* claim is raised, the trial court must first determine "whether the State had a duty to preserve the evidence." *Merriman*, 410 S.W.3d at 785. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). To meet the constitutionally material evidence standard, "the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Ferguson*, 2 S.W.3d at 917.

If the proof establishes that the State had a duty to preserve the evidence and that the State failed in its duty, the court must conduct a balancing analysis, considering the following factors: "(1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction." *Id.* (citation and footnote omitted). The trial court must balance these factors to determine whether a trial would be fundamentally fair absent the missing evidence. *Merriman*, 410 S.W.3d at 785. If the trial court concludes that a trial would be fundamentally unfair absent the missing evidence, "the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 786.

This court reviews the trial court's decision regarding the fundamental fairness of a trial conducted without the missing evidence de novo. *Merriman*, 410 S.W.3d at 791. The trial court's findings of fact are conclusive on appeal unless the evidence preponderates against them. *See id.* (citations omitted). This court reviews the trial court's remedy for a *Ferguson* violation under the abuse of discretion standard. *Id.*

Evidence of six pornographic videos was found inside the Defendant's bedroom that she shared with Mr. Henson. One photograph showed a DVD on top of two books of a sexual nature, and it bore the title "La Vecina Caliente" (translated from Spanish as "The Hot Neighbor") and contained six hours of explicit content. Other photographs depicted five casings of pornographic videos; however, there were no photographs of the actual videos themselves. In addition, Detective Zickefoose was never asked to confirm the contents of the casings.

Generally, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." *Ferguson*, 2 S.W.3d at 917. This includes "books, papers, documents, photographs, tangible objects, . . . which are within the possession, custody or control of the State[.]" Tenn. R. Crim. P. 16(a)(1)(C). Here, the State admits that the evidence was destroyed following Mr. Henson's trial. If the State had a duty to Mr. Henson to preserve the evidence, the State had the same duty to the Defendant, who was prosecuted on similar charges. Therefore, the Defendant should have been allowed, at a minimum, to confirm the videos and the casings matched. We conclude that the State had a duty to preserve the evidence.

Relative to the degree of negligence involved, Detective Zickefoose acknowledged that he destroyed the videos after Mr. Henson's trial. Simply because the State chose to prosecute Mr. Henson first, the State was not relieved of its responsibility to preserve evidence if possible charges were to be brought against the Defendant. We conclude that the State was grossly negligent. *See State v. Dustin Wayne Capps*, No. E2007-02734-CCA-R3-CD, 2009 WL 690685, at *5 (Tenn. Crim. App. Mar. 13, 2009) (concluding that the State's loss of evidence was gross negligence when officer took videotape out of the confiscation holds department of the police department and then returned the videotape to the originating store), *abrogated on other grounds by Merriman*, 410 S.W.3d at 791.

Relative to the significance of the destroyed videos in light of their probative value and the reliability of secondary or substitute evidence available, Count Three was based upon the Defendant's showing the victim pornographic movies in the back room. However, none of the other charges relied upon the Defendant's showing or viewing the pornographic movies with the victim. In addition, the Defendant merely theorizes that these pornographic videos could have provided the basis for the victim's sexual knowledge and for showing that her reports of abuse mirrored the activity in the videos. Even if these videos simulated similar activity, this would not necessarily belie the victim's testimony that these same things happened to her. In addition, these pornographic videos were not unique evidence, and defense counsel offered only an assertion that substitute videos were not obtainable by some other means. *See State v. Demetrious Tommy Lee*, No. M2020-00914-CCA-R3-CD, 2021 WL 3825219, at *10 (Tenn. Crim. App. Aug. 27, 2021) (holding that the defendant failed to show that the audio recording was of such a nature that he

would be unable to obtain comparable evidence when another recording of audio and video of the incident existed). Based upon these factors, we conclude with the evidence was of marginal significance.

Relative to the sufficiency of the other evidence convicting the Defendant, the victim went into detail during her forensic interview. Sex toys, books of a sexual nature, and condoms were all found in the Defendant's bedroom, which corroborated various details of the victim's statement. Moreover, the defense was not prohibited from presenting its theory that the victim learned about sexual matters from the pornographic movies, thereby challenging her credibility. Indeed, the defense argued as much during closing argument, also pointing out that the police had destroyed the videos. Nonetheless, the jury credited the victim's testimony. In addition, the Defendant never asked for a curative instruction during the trial, and therefore, the only remedy at the motion for new trial would have been dismissal of the indictment.

We conclude that the record does not reflect that the Defendant was deprived of a fair trial due to the State's failure to preserve the pornographic videos. Accordingly, the Defendant is not entitled to relief from this issue.

We note that the judgment form in Count Five does not reflect the jury's guilty verdict. As a result, we remand for the entry of a corrected judgment reflecting a guilty verdict in Count Five.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we reverse the judgment of the trial court in Count Thirteen, vacate the conviction, and dismiss the charge. We, likewise, remand for the entry of a corrected judgment in Count 5. The judgments of the trial court are affirmed in all other respects.

_____
ROBERT H. MONTGOMERY, JR., JUDGE